# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**KENNETH E. LEE,**

      **Plaintiff,**

*vs.*                               **Civil Action No. 5:04CV109**
                                            **(Judge Frederick P. Stamp, Jr.)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Kenneth E. Lee brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

### I. Procedural History

Kenneth E. Lee ("Plaintiff") filed an application for SSI and DIB on June 5, 2002, alleging disability since March 15, 2002, due to COPD, emphysema, nerves, and rheumatoid arthritis (R.

14, 66-68, 81).[1] The state agency denied Plaintiff's application initially and on reconsideration (R. 44, 45, 270, 276). Plaintiff requested a hearing, which Administrative Law Judge Donald T. McDougall ("ALJ") held on June 24, 2003, in Wheeling, West Virginia., and at which Plaintiff, represented by counsel, Jonathan Bowman, and Eugene Czuczman, a vocational expert ("VE") testified (R. 318-358). On October 15, 2003, the ALJ entered a decision finding Plaintiff was not disabled (R. 14-23). On July 27, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6-9).

## II. Statement of Facts

Plaintiff was born on March 4, 1954, making him forty-eight (48) years old at the time of the administrative hearing. Plaintiff attained an eleventh-grade education (R. 324). His past work included taxi driver and taxi company dispatcher (R. 75-76, 337).

The ALJ applied *res judicata* to the period prior to Plaintiff's March 15, 2002, onset date. In his decision, he stated the following:

> Although the claimant asserted disability since May/June 1999 (Exhibit B1E), the Administrative Law Judge finds that there is no basis for reopening the prior decision in that there is no new and material evidence or other basis to do so. 20 CFR §§ 404.987-989 and 416.1487-1489. Consequently, the prior decision is final and binding on the issue of disability during the previously adjudicated period through March 14, 2002. The period of adjudication covered by this decision is from March 15, 2002, to the present (R. 14-15, 34-43).

---

[1]Plaintiff previously filed applications for disability benefits in 1977, 1993, 1997, 1998, and April 17, 2000, all of which were denied. The April 17, 2000, application was denied (post-hearing) in a decision entered March 14, 2002, by Administrative Law Judge Donald T. McDougall, the ALJ in the instant case. Appeals Council denied Plaintiff's request for review on April 29, 2002. Thereafter, Plaintiff filed the instant claim, alleging an onset date of March 15, 2002 (R. 14, 51, 66-68). As noted in Plaintiff's brief, while the June 5, 2002, claim was pending before the Appeals Council, Plaintiff filed a subsequent SSI application, which was approved by the state agency, with an onset date of June 2004 (Plaintiff's brief at p. 2).

The undersigned will, therefore, only briefly review and consider the medical evidence or record prior to Plaintiff's onset date of March 15, 2002.

Medical Evidence of Record Prior to March 15, 2002

A July 6, 2000, pulmonary function test performed on Plaintiff showed "severe mixed obstructive/restrictive disease." However, the results were noted as "questionable" because "poor panting technique" was "noted, even with repeated instructions" (R. 232). On the same date, a "barium swallow/GI series" was performed on Plaintiff, which was "unremarkable," except for a "small reducible hiatal hernia with mild gastroesophageal reflux" (R. 231). On July 31, 2000, Plaintiff was diagnosed by Michael W. Blatt, M.D., with COPD, asthma, "GE" reflux, pulmonary fibrosis, and tobacco dependency. Dr. Blatt counseled Plaintiff to "quit smoking" (R. 198). A September 13, 2000, CT scan of Plaintiff's chest showed "no change in the small right lower lobe nodule" and "diffuse 'ground-glass' opacity seen within the lungs" which was "consistent with COPD" (R. 227). On December 12, 2000, frontal and lateral chest x-rays were taken of Plaintiff, which showed "improvement of interstitial pattern, although there [was] still severe fibrotic appearing interstitial change present" as compared to a previous test (R. 233).

On April 5, 2001, Plaintiff was diagnosed by Dr. Blatt with "[e]mphysema/COPD/tobacco dependency" (R. 198). On June 4, 2001, Dr. Blatt opined, based on his impression of a May 23, 2001, x-ray of Plaintiff's chest, that Plaintiff's "perihilar infiltrates [were] worsening" (R. 200). On August 1, 2001, Plaintiff returned to Dr. Blatt, who observed reduced breath sounds but no respiratory distress. Dr. Blatt prescribed Celestone IM for Plaintiff to inhale and counseled Plaintiff to cease smoking (R. 201). An October 19, 2001, x-ray of Plaintiff's chest revealed a "slight increase in the interstitial markings in the lower zones"of Plaintiff's lungs. Peter V. Caruso, M.D.,

3

opined Plaintiff's condition may "be chronic"; however, he was unable to "exclude an acute interstitial infiltrate." He recommended a follow-up (R. 164).

On January 11, 2002, spirometry testing showed "normal lung volume" with "reduced diffusion" (R. 235). A March 5, 2002, x-ray of Plaintiff's chest showed "chronic changes . . . in the lungs," but no change from the October 19,2001, exam (R. 161).

Medical Evidence of Record Beginning March 15, 2002

On May 13, 2002, Dr. Blatt examined Plaintiff. Plaintiff complained of "coughing up white phlegm" and "bloody sputum." He informed Dr. Blatt that he was smoking one-half package of cigarettes per day. Dr. Blatt observed "no moderate distress" of Plaintiff while he was "at rest." Dr. Blatt noted Plaintiff had decreased breath sounds, but no "rales or rhonchi." Plaintiff was positive for wheezing "on forced expiration." Dr. Blatt diagnosed bronchitis, prescribed Kenalog IM, and provided samples of Levaquin. Dr. Blatt instructed Plaintiff to return for a six-month examination (R. 201).

On June 4, 2002, Plaintiff sought a refill for Lasix from Thomas J. Schmitt, M.D. On June 28, 2002, Plaintiff was referred by Dr. Schmitt to the Wheeling Hospital emergency department for evaluation of chest pains. On July 29, 2002, Plaintiff informed Dr. Schmitt that he had experienced difficulty breathing because of the "heat and humidity." Plaintiff was, at that time, compliant with his prescribed medications and presented with no side effects therefrom. His blood pressure was 138/90 (R. 160).

Plaintiff complained of "back aches" to Dr. Schmitt on August 13, 2002. Plaintiff's straight-leg raising test was negative, both left and right. Plaintiff's blood pressure was 115/80. Dr. Schmitt diagnosed a lumbar strain and he prescribed Flexeril for Plaintiff's pain (R. 160).

4

On August 28, 2002, Stephen Nutter, M.D., of Tri-State Occupational Medicine, Inc., located in Huntington, West Virginia, provided the results of an Internal Medicine Examination he had completed on Plaintiff to the West Virginia Disability Determination Division. Plaintiff informed Dr. Nutter that he claimed disability because his "regular doctor told me I have COPD and emphysema." Plaintiff stated the following to Dr. Nutter: 1) he had experienced breathing problems for the past three (3) years and had sought treatment for that condition for the past two (2) years; 2) he wheezed and coughed frequently; 3) he smoked; 4) temperature extremes worsened his breathing; 5) he had no allergies; 6) he used inhalers; 7) he became short of breath when he walked ten (10) feet on flat ground; and 8) he did not have edema, hemoptysis, pneumonia, chronic bronchitis, tuberculosis, or asthma (R. 127). Plaintiff informed Dr. Nutter that he took the following medications: Zyrtek, Naproxen, Lasix, Theophylline, Wellbutrin, Ranitidine, Zoloft, Motrin, Ipratropium, Nitrostat, Hydrochlorothiazide, Albuterol inhaler, Serevent inhaler, and Vanceril (R. 127-28). Plaintiff also informed Dr. Nutter that he had had a cholecystectomy, did not use drugs or alcohol, had attained an eleventh-grade education, and had last been employed in 1998 as a cab dispatcher (R. 128).

Plaintiff stated he had developed rheumatoid arthritis at the age of fourteen (14) when he had rheumatic fever. According to Plaintiff, he had joint pain in his knees and ankles, but no redness, warmth or tenderness. Prescription strength ibuprofen was the drug Plaintiff used to medicate the pain and he wore boots to "support his ankles" (R. 128). Plaintiff also stated he had experienced back pain since the age of fourteen (14). He informed Dr. Nutter that a x-ray of his back revealed "arthritis in the joints," which caused intermittent pain and "bother[ed] him a few times per month," but did not radiate. According to Plaintiff, his back pain was exacerbated when he bent, stooped,

5

sat, lifted, stood, coughed, or rode in a car. Plaintiff treated his back pain with physical therapy and use of a thermal patch (R. 128-29). Plaintiff stated he experienced chest pains that felt "like somebody stabbing him." These pains lasted "about five minutes" one (1) time per month, and Plaintiff treated them with nitroglycerin. Plaintiff's chest pains were caused by exertion, stress, and coughing, but not food. Plaintiff stated the results of the chest pains were shortness of breath, diaphoresis, and wakefulness, but not nausea. Plaintiff informed Dr. Nutter that he had undergone an EKG and stress test for this condition (R. 129).

Plaintiff's general physical examination by Dr. Nutter revealed he had a normal gait, used no assistive devices, was stable at station, was comfortable in a sitting position, was uncomfortable in a supine position, had normal intellectual functioning, and had good recent and remote memory. Plaintiff did not present with "thyromegaly, palpable masses, lymph-adenopathy, jugulovenous distention or hepatojugular reflux" when Dr. Nutter examined his neck (R. 129). Plaintiff's lungs were "clear to percussion," but had faint wheezes on auscultation and "dry-sounding crackles" that were not pronounced. The breath sounds were "symmetrical bilaterally" and "no accessory muscle recruitment" was noted. Plaintiff was "short of breath" during exertion and while lying flat. Clubbing, but not cyanosis, was noted (R. 129-130).

Plaintiff's heart revealed a regular rate and rhythm, with "no murmur, gallop or rub." Plaintiff's "radial, dorsalis pedis and posterior tibial pulses" were normal at "2+/4" and revealed no "bruits, except for the left dorsalis pedis pulse, which was 1+/4." No edema, peripheral vascular insufficiency, or chronic venous stasis changes were observed (R. 130).

An examination of Plaintiff's upper extremities and hands revealed the following: 1) pain and tenderness over medial epicondyle of left elbow (had "just started" on the date of the examination); 2) non-tender right elbow, shoulders, and wrists; 3) no hand atrophy; and 4) no

6

tenderness, redness, warmth, or swelling of hands. Plaintiff was able to write and pick up coins with both hands; his grip strength was graded "5/5 bilaterally." Dr. Nutter noted Plaintiff experienced pain in his knees when he squatted and during his range of motion testing and that crepitus was present in both knees, but none in his ankles or feet (R. 130).

Plaintiff presented with no tenderness or paravertebral muscle spasm in his cervical spine (R. 130). No paravertebral muscle spasm was detected in Plaintiff's dorsolumbar spine, but tenderness was present. Plaintiff stated he experienced pain in his lumbar spine during the range of motion test; Plaintiff's straight leg raising was normal in both the sitting and supine positions. Plaintiff had no hip joint tenderness, redness, warmth, swelling, or crepitus and he was able to stand on one leg at a time without difficulty (R.130-31).

Plaintiff's neurological exam revealed intact cranial nerves; normal muscle strength and tone in all extremities; no atrophy; well-preserved sensory modalities; normal and symmetrical biceps, triceps, brachioradialis, patellar, and Achilles deep tendon reflexes; no clonus; and intact cerebellar function. Dr. Nutter observed that Plaintiff was able to perform a tandem gait, but that he could not rise from a squat position without assistance due to knee pain (R. 131).

Dr. Nutter's impression was for shortness of breath with a history of COPD, chest pain, chronic back pain with a lumbosacral strain and reported history of rheumatoid arthritis, and arthralgia. Dr. Nutter opined that Plaintiff's chest pains may be a result of angina (R. 131). Dr. Nutter noted Plaintiff's revealed no radiculopathy in his straight leg raise test, no nerve root compression, and no rheumatoid arthritis in that no rheumatoid nodules, capsular thickening, periarticular swelling, or tophi were present. Additionally, Dr. Nutter did not observe the presence of ulnar deviation (R. 132).

7

An x-ray was made of Plaintiff's chest on August 28, 2002, and it was normal (R. 133). A ventilatory function test was also performed on Plaintiff on August 28, 2002, and it was positive for mild COPD and mild restrictive pulmonary disease (R. 136).

On September 10, 2002, Plaintiff was seen by Dr. Blatt. He informed Dr. Blatt that his shortness of breath was increasing and that he would become "short of breath when he [took] the garbage out." Plaintiff told D. Blatt that his chest felt tight. Plaintiff admitted he continued smoking. Dr. Blatt's examination of Plaintiff revealed no rales or rhonchi, but wheezes were present on forced expiration. Dr. Blatt diagnosed chronic obstruction lung disease and tobacco dependency. Dr. Blatt "warned the patient to quit smoking." He prescribed NicoDerm and Combivent, Albuterol, and Atrovent, and provided Plaintiff with a Z-Pak (R. 202).

On September 11, 2002, Thomas E. Andrews, Ph.D., performed a Mental Status Examination of Plaintiff. Dr. Andrews noted Plaintiff did not show any signs of pain during the examination, but he had shown "mild respiratory distress initially." Dr. Andrews opined Plaintiff was "very friendly and cooperative for the most part" and cooperative throughout the testing. During the testing, Plaintiff displayed eye contact, offered normal responses, was "able to carry on a conversation," and demonstrated a sense of humor. The relevancy and coherency of Plaintiff's speech patterns were normal, as were his production, pace, and tone quality of his speech. Plaintiff was also aware of time, person, and place during the testing (R. 142).

Dr. Andrews observed the following objective symptoms: Plaintiff's 1) mood was normal; 2) affect was broad; 3) thought process was normal; 4) thought content was normal; 5) perception was normal; 6) response to a judgment question was average; 6) immediate memory was normal; 7) recent memory was normal; 8) remote memory was normal; 9) concentration was mildly deficient;

and 10) psychomotor behavior was normal. Plaintiff presented with no suicidal or homicidal ideation (R. 143). Plaintiff's subjective symptoms were wakefulness, fluctuating weight, low energy, mood swings, anger, and suicidal thoughts (R. 141, 143).

Plaintiff's daily activities were rising at 9:00 a.m., drinking coffee and smoking four (4) cigarettes, watching television, cleaning house, doing dishes, lounging, playing computer games, checking the mail, driving wife to grocery store, putting away groceries, serving dinner, and retiring between 1:00 a.m and 4:00 a.m. (R. 143). The following is the frequency with which Plaintiff performed activities of daily living: 1) groomed once per day; 2) cleaned once per week; 3) washed dishes once per day; 4) gardened once per month; 5) ran errands once per week; 6) drove car once per day; 7) "fetched fuel" six times per year; 8) sat on porch once per month; 9) watched television once per day; 10) listened to radio once per day; and 11) collected model cars (R. 143-44).

Dr. Andrews made the following diagnosis: 1) Axis I – no diagnosis; 2) Axis II – "provisional BIF on clinical impression"; and 3) Axis III – COPD, emphysema, and other medical problems "on self-report" (R. 143). Dr. Andrews concluded his report by opining Plaintiff's social functioning, concentration, persistence, pace, immediate memory, recent memory, and remote memory were within normal limits and that Plaintiff could manage benefits (R. 144).

On September 18, 2002, a state agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. The state agency physician opined Plaintiff could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds, stand and/or walk for about six (6) hours in an eight (8) hour workday, sit for a total of about six (6) hours in an eight (8) hour workday, and push and/or pull unlimited (R. 148). The state agency physician found Plaintiff should occasionally limit climbing ladders, ropes, and scaffolds, balancing, stooping, kneeling,

crouching, and crawling (R. 149). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 150-51). The state agency physician found Plaintiff should avoid concentrated exposure to extreme cold, heat, humidity, noise, and hazards. The state agency physician also found Plaintiff should avoid even moderate exposure to wetness and should avoid all exposure to fumes, odors, dusts, gases, and/or poor ventilation (R. 151). The state agency physician found Plaintiff's RFC to be for light work (R. 152).

On September 24, 2002, Plaintiff complained of left elbow pain to Dr. Schmitt. He stated he had not injured his elbow and that he could not lift it without experiencing pain. Plaintiff's blood pressure was 110/85. Dr. Schmitt prescribed Bextra (R. 160). On October 1, and October 14, 2002, Plaintiff returned to Dr. Schmitt with complaints of pain in his left elbow. Plaintiff's blood pressure was 116/80 on October 1, 2002, and 110/80 on October 14, 2002 (R. 159).

On October 4, 2002, Samuel Goots, Ph.D., completed a Mental Residual Functional Capacity Assessment of Plaintiff. Dr. Goots found Plaintiff's ability to remember locations and work-like procedures and to understand and remember very short and simple instructions were not significantly limited. He found Plaintiff's ability to understand and remember detailed instructions were moderately limited (R. 192). Dr. Goots found Plaintiff was not significantly limited in his ability to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; ability to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 192-93). Dr. Goots

10

found Plaintiff was moderately limited in his ability to carry out detailed instructions and maintain attention and concentration for extended periods of time (R. 192). Dr. Goots found Plaintiff's abilities to socially interact and adapt were not significantly limited (R. 193). Dr. Goots opined that Plaintiff retained "the capacity to understand and follow routine . . . instructions with ordinary supervision" (R. 194).

On November 22, 2002, Dr. Schmitt completed "Form: Physical Residual Functional Capacity Questionnaire" of Plaintiff. He based his finding of Plaintiff's RFC on his opinion that Plaintiff had hypertension, COPD, coronary artery disease, and hiatal hernia. Plaintiff's symptoms were "chest pains" and "dizziness" (R. 205). Dr. Schmitt opined the following: 1) Plaintiff's impairments had lasted or were expected to last twelve (12) months; 2) Plaintiff was not a malingerer; 3) depression and psychological factors were affecting Plaintiff's physical condition; 4) Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations listed in the questionnaire; and 5) Plaintiff's pain and symptoms were severe enough to frequently interfere with his attention and concentration. Dr. Schmitt opined, based on his observation of Plaintiff in a work situation, that Plaintiff was incapable of performing low stress jobs (R. 206).

Dr. Schmitt opined Plaintiff could walk one-half (½) city block before resting or experiencing severe pain; could sit one (1) hour, thirty (30) minutes before having to rise; and stand one (1) hour, twenty (20) minutes before having to sit (R. 206-07). Dr. Schmitt found Plaintiff could sit and stand for less than two (2) hours each day. Plaintiff needed to walk every fifteen (15) minutes for ten (10) minutes during an eight (8) hour workday according to Dr. Schmitt (207). Dr. Schmitt opined Plaintiff required unscheduled breaks every hour during an eight (8) hour workday, elevation of his legs at forty-five (45) degrees, and elevation of his legs eighty (80) percent of the

11

time in an eight (8) hour workday if he were employed at a sedentary job. Dr. Schmitt opined Plaintiff did not require the use of a cane or other assistive device while walking or standing (R. 207). According to Dr. Schmitt's findings, Plaintiff could never lift more than ten (10) pounds, twist, stoop, crouch, climb ladders, and/or climb stairs. Dr. Schmitt noted Plaintiff's impairments caused "good" and "bad" days and that Plaintiff would be absent from work more than four (4) days per month as a result of his impairments (R. 208).

On December 20, 2002, Dr. Schmitt completed a Routine Abstract Form Physical for the State of West Virginia Disability Determination Section. He noted thereon that Plaintiff alleged he had emphysema, rheumatoid arthritis, and heart murmur (R. 156). Dr. Schmitt found Plaintiff's vision, hearing, speech, gait and station, fine motor ability, gross motor ability, joints, ranges of motion, muscle bulk, reflexes, motor strength, coordination, mental status, breath sounds, edema, heart sounds, extremities, circulation, abdomen, ascites, and skin were all normal. Additionally, Dr. Schmitt opined Plaintiff presented with no sensory deficits; his dyspnea was normal except with exertion; he had no orthopnea or cyanosis; his heart sounds produced normal sinus rhythm; Plaintiff presented with no chest pain or evidence of congestive heart failure (R. 157). Based on these findings, Dr. Schmitt found Plaintiff was "totally disabled from ... [h]ypertension, [c]oronary artery disease [and] advanced C.O.P.D" (R. 158).

On January 9, 2003, Fulvio Franyutti, M.D., a state agency physician, found Plaintiff could occasionally lift and/or carry fifty (50) pounds, frequently lift and/or carry twenty-five (25) pounds, stand and/or walk about six (6) hours in an eight (8) hour workday, sit for a total of about six (6) hours in an eight (8) hour workday, and push/pull unlimited (R. 168). Dr. Franyutti found Plaintiff had no postural, manipulative, visual, or communicative limitations (R. 169-71). The state agency

physician found Plaintiff should avoid concentrated exposure to extreme cold, but his exposure to extreme heat, wetness, humidity, noise, vibrations, fumes, and hazards was unlimited (R. 171). Dr. Franyutti found Plaintiff's RFC was reduced to medium because of his "pain & fatigue" (R. 172). The state agency physician noted the following: "TP – states claimant totally disabled." The state agency physician disagreed with the treating physician's "statement" in that he found "[p]atient could perform medium work" (R. 173). Dr. Franyutti further observed and noted Plaintiff's "[s]igns/symptoms" from Dr. Schmitt's December 20, 2002, examination were "all normal except dyspnea [with] exertion" (R. 174).

On January 24, 2003, Dr. Blatt examined Plaintiff. Plaintiff complained of having a "cold with clear mucus." He stated his exercise capacity was reduced and he had chest tightness. Dr. Blatt observed decreased breath sounds and no rales, rhonchi, or wheezes. Dr. Blatt's impression was that Plaintiff had "evidence of COPD." Dr. Blatt prescribed Kenalog IM, prednisone, and Levaquin. Plaintiff was instructed to "quit smoking" (R. 203).

Also on January 24, 2003, Dr. Blatt completed a "Form: Pulmonary Residual Functional Capacity Questionnaire" of Plaintiff. His diagnosis was for COPD, which included the following symptoms: shortness or breath, orthopnea, chest tightness, wheezing, rhonchi, episodic acute asthma, episodic acute bronchitis, fatigue, and coughing. Dr. Blatt found the identifying precipitating factors to Plaintiff's asthma attacks were upper respiratory infection, emotional upset/stress, and cold air/change in weather (R. 209). Dr. Blatt opined Plaintiff was not a malingerer, emotional factors contributed to the severity of Plaintiff's symptoms, and Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations contained in the evaluation. Dr. Blatt noted Plaintiff's symptoms were severe enough to frequently interfere with

his attention and concentration and that Plaintiff could tolerate moderate work stress (R. 210).

In assessing Plaintiff's functional limitations, Dr. Blatt found the following: 1) Plaintiff could walk "0" city blocks before he had to rest; 2) Plaintiff could sit twenty (20) minutes before he needed to rise; 3) Plaintiff could stand twenty (20) minutes before he needed to sit or walk; 4) Plaintiff could sit, stand and/or walk for less than two (2) hours in an eight (8) hour workday; and 5) Plaintiff needed to take unscheduled breaks to sit during an eight (8) hour workday (Dr. Blatt did not express an opinion as to the frequency or length of these unscheduled breaks). Dr. Blatt found Plaintiff could rarely lift less than ten (10) pounds, occasionally twist, but never stoop, crouch, climb ladders, or climb stairs (R. 211).

Dr. Blatt opined Plaintiff should avoid all exposure to extreme cold, extreme heat, high humidity, fumes, odors, dusts, gases, perfumes, cigarette smoke, soldering fluxes, solvents, cleaners, and chemicals. The doctor noted Plaintiff's impairments would produce "good" and "bad" days and that Plaintiff would likely be absent from work as a result of his impairments or treatments therefor for more than four (4) days per month (R. 212).

On February 26, 2003, Plaintiff was examined by Dr. Blatt, who observed Plaintiff was "doing much better than he was a month ago." Dr. Blatt noted Plaintiff still coughed and had difficulty breathing. Plaintiff presented with decreased breath sounds, but no rales or rhonchi. Wheezes were "present on forced expiration." Dr. Blatt provided samples of Combivent, prescribed Pulmicort, Dynabac, and Aristopan, and instructed Plaintiff to cease smoking (R. 204).

On February 28, 2003, Plaintiff complained of anthralgia to Dr. Schmitt. Neurological examination results showed no focal deficits (R. 196). On April 17, 2003, Dr. Schmitt observed Plaintiff's COPD was worsening and that he should cease smoking. On May 2, 2003, Dr. Schmitt

again instructed Plaintiff to reduce his smoking of cigarettes (R. 197).

On June 21, 2003, a x-ray was taken of Plaintiff's chest at Wheeling Hospital because of his having experienced chest pain. The x-ray was compared to the June 28, 2002, x-ray of Plaintiff's chest. Plaintiff's heart was normal in size. There was no pulmonary edema , pneumothorax, or pleural effusion found. The impression was as follows: "left basilar infiltrate vs atelectasis, superimposed on a background of chronic interstitial changes" (R. 247).

On June 22, 2003, Plaintiff was admitted to Wheeling Hospital with complaints of chest pain. He was treated by Armando Araujo, M.D. Plaintiff stated the chest pain lasted less than one hour, he became short of breath, and he experienced diaphoresis. Plaintiff stated he did not experience any nausea, vomiting, dizziness, fainting, or radiation of the discomfort. Plaintiff's symptoms improved when he was given sublingual nitroglycerin. Plaintiff informed Dr. Araujo that he had not experienced chest pain with daily activity (R. 249).

Plaintiff informed Dr. Araujo that he "usually denie[d] shortness of breath, cough, hemoptysis." Dr. Araujo observed Plaintiff's chest had "good diaphragmatic excursion," his lungs were "essentially clear to auscultation," and his heart had a "regular rate and rhythm [and] no murmur" (R. 250). Dr. Araujo found Plaintiff could move all extremities, he had no ankle edema or cyanosis, and his peripheral pulses were palpable. He also noted Plaintiff's "deep tendon reflexes [were] two plus and there [were] no apparent sensory deficits." Dr. Araujo diagnosed chest pain, "rule out myocardial infarction"; history of COPD; and history of rheumatic fever (R. 251).

On June 23, 2003, Dr. Schmitt evaluated Plaintiff while he was still a patient at Wheeling Hospital. Dr. Schmitt observed Plaintiff to be "awake, alert and oriented times three and in no acute distress . . . ." Plaintiff's "jugular venous pressure [was] less than 5cm of water"; "carotids

bilaterally 2/4 without bruits"; and there was no thyromegaly "appreciated." Plaintiff's cardiac examination showed "a nondisplaced point of maximal impulse with no gallop or murmur appreciated." Plaintiff's heart rhythm was regular and his lungs were bilaterally clear to auscultation (R. 244).

Dr. Schmitt noted Plaintiff's "EKG on admission demonstrated sinus rhythm at 112 with normal axis of 30 degrees. No Q waves. No significant resting ischemic ST or T wave changes noted. Review of telemetry since admission demonstrate[d] sinus rhythm without ectopy." He further noted the "EKG of 6/22/03 demonstrate[d] sinus rhythm at 76 with normal interval in durations and unchanging axis with no Q waves and no significant resting ischemic ST or T wave changes" (R. 244).

Dr. Schmitt's impression was "chest pain atypical of angina" and "risks for coronary artery disease include hypertension, continuing tobacco abuse. Pre-test probabilities of coronary artery disease is estimated at 30-50%." Dr. Schmitt prescribed Plaintiff take a low dose aspirin and a low dose beta blocker and he recommended Plaintiff limit activities until he underwent a stress test and the results were evaluated (R. 245).

On June 25, 2003, Plaintiff was seen by Dr. Schmitt at his office. He instructed Plaintiff to cease smoking (R. 248).

On July 3, 2003, Plaintiff underwent a stress test. There were no complications, no wall motion abnormalities, and "no perfusion abnormalities on either rest or stress images." The impression was as follows: "suboptimal examination showing no scintigraphic evidence of left ventricular ischemia" (R. 246).

16

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ McDougall made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since March 15, 2002.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal, alone or in combination, one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7. The claimant has the following residual functional capacity: light work with the ability to briefly (1-2 minutes) change positions every 30 minutes; no more than moderate exposure to heat, cold, wetness, or humidity, and no significant exposure to fumes, dusts, gasses, or other respiratory irritants; no detailed or complex instructions; and no close concentration or attention to detail for extended periods.

8. The claimant's past relevant work as taxi dispatcher did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR §§ 404.1565 and 416.965).

9. The claimant's medically determinable impairments do not prevent the claimant from performing his past relevant work.

10. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(e) and 416.920(e)) (R. 22).

17

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

The Plaintiff contends:

1.    ALJ should have afforded treating source [sic] opinions great weight.

The Commissioner contends:

1.    Substantial evidence supports the ALJ's finding that the opinions of Plaintiff's treating physicians were not entitled to significant weight because they were not supported by objective medical findings and were inconsistent with other substantial evidence.

## C. Treating Physician

Plaintiff contends the ALJ should have afforded treating source [sic] opinions great weight.

The Defendant contends substantial evidence supports the ALJ's finding that the opinions of Plaintiff's treating physicians were not entitled to significant weight because they were not supported by objective medical findings and were inconsistent with other substantial evidence. Plaintiff, in his brief, argues the "opinion of a treating physician should only be disregarded if there is persuasive contradictory evidence." (Plaintiff's brief at pp. 8-9). In support of this argument, Plaintiff cites *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983), in which the Fourth Circuit held that "[w]hile the Secretary is not bound by the opinion of the claimant's treating physician, that opinion is entitled to great weight for it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time. Therefore, it may be disregarded only if there is persuasive contradictory evidence." The Plaintiff also refers to the case of *Coffman v. Bowman*, 829 F. 2d 514, 518 (4th Cir. 1987), which mandates "[a] well established rule followed with minor variations in almost every circuit is the so-called attending physicians rule. As applied in the Fourth Circuit, that rule requires that the opinion of the claimant's treating physician be given great weight and may be disregarded only if there is persuasive contradictory evidence." Additionally, in *Craig v. Chater*, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

[4,5] By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

As to the opinion of Dr. Blatt, the ALJ found the following:

The Administrative Law Judge has considered Dr. Blatt's pulmonary residual functional capacity assessment dated January 24, 2003, which limited the claimant to less than sedentary exertional level with an inability to sit, stand, and/or walk for more than two hours in an eight-hour workday and that he would be absent from work more than four days per month due to his impairments. (Exhibit B11F). As was determined in the prior decision regarding Dr. Blatt's prior opinion, the Administrative Law Judge gives very little weight to this assessment. First, it is not supported by Dr. Blatt's treatment records . . . and in the prior decision that did not report the numerous symptoms listed or that the claimant had asthma attacks, which was not even diagnosed since the prior decision or listed on the assessment. Second, this assessment is not consistent with Dr. Nutter's physical examination, the "mild" pulmonary function testing, and relatively benign chest x-rays. In fact, the claimant denied that he had asthma or chronic bronchitis to Dr. Nutter. (Exhibit 1F.p1). Additionally, the claimant has continued to smoke cigarettes and had not been hospitalized for any respiratory problem, contrary to his testimony (R. 19-20).

In support of his decision to assign "very little weight" to the opinion of Dr. Blatt as found in his pulmonary residual functional capacity assessment of Plaintiff, the ALJ evaluated Dr. Blatt's treatment records (R. 19). He found as follows:

The treatment notes from the claimant's treating pulmonary specialist Dr. Blatt, showed no significant change since the prior decision, consistently reporting the claimant to be in no respiratory distress with only decreased breath sounds and occasional wheezes on forced expiration but no rales or rhonci [sic]. The claimant ignored Dr. Blatt's repeated warnings to quit smoking. (Exhibit B9F) (R. 19).

This opinion of the ALJ is supported by the substantial evidence of record. On May 13, 2002, Dr. Blatt observed Plaintiff had decreased breath sounds, wheezing "on forced expiration, but no "rales or rhonchi" and diagnosed bronchitis (R. 201). September 10, 2002, Dr. Blatt observed Plaintiff had wheezes on forced expiration, but no rales or rhonchi; diagnosed COPD; and instructed Plaintiff

to "quit smoking" (R. 202). On January 24, 2003, Dr. Blatt observed Plaintiff had decreased breath sounds, but no rales, rhonchi, or wheezes; opined Plaintiff had "evidence of COPD"; and instructed Plaintiff to "quit smoking" (R. 203). On February 26, 2003, Dr. Blatt observed Plaintiff had decreased breath sounds, wheezes on forced expiration, but no rales or rhonchi; opined Plaintiff was "doing much better than he was a month ago"; and instructed Plaintiff to cease smoking (R. 204). The undersigned finds this is substantial evidence to support the ALJ's findings that Dr. Blatt's pulmonary residual functional capacity assessment was not consistent with his own opinions and assessments as found in his treatment records of Plaintiff.

Additionally, the ALJ identified the following persuasive contradictory evidence to Dr. Blatt's pulmonary residual functional capacity assessment:

> Pulmonary function tests performed for Dr. Blatt on January 11, 2002, reported results above 80% of predicted, noting normal lung volume with reduced diffusion. (Exhibit B13F, p22). Also, Dr. Schmitt, the claimant's primary care physician, reported in his MSS normal respiratory clinical signs except for dyspnea "with exertion." (Exhibit B4F, p2). A chest x-ray taken on March 5, 2002, reported no change since the previous examination on October 19, 2001. (Exhibit B4F, 6p). Furthermore, pulmonary function testing by Dr. Nutter on August 28, 2002, showed only "mild COPD and "mild" restrictive pulmonary disease. A chest x-ray taken the same day was read as normal, reporting clear lung fields. Dr. Nutter did report wheezes and crackles in the lung bases and noted clubbing of the fingernails, but the claimant had no cyanosis and no dyspnea was observed. (Exhibit B1F, p10) (R. 19).

> Moreover, during the recent hospitalization in June 2003, for chest pain, the examining physician reported the claimant's lungs to be bilaterally clear to auscultation. A chest x-ray taken at that time noted the pulmonary fibrosis that was seen on the December 12, 2000 exam. (Exhibit B14F) (R. 19).

The substantial evidence of record noted above by the ALJ constitutes persuasive evidence that contradicts Dr. Blatt's opinion. Specifically, the medical tests and laboratory findings considered and evaluated by the ALJ above were unremarkable. The March 5, 2002, chest x-ray showed no changes since October 19, 2001 (R. 161); the August 28, 2002 x-ray considered by Dr.

Nutter was normal (R. 133); the August 28, 2002, ventilatory function test was positive for mild

COPD and mild restrictive pulmonary disease (R. 136); and the June, 2003, x-ray showed the same

pulmonary fibrosis that was evident in December, 2000 (R. 247). Additionally, the opinions of

other physicians who evaluated or treated Plaintiff provided persuasive contradictory evidence to Dr.

Blatt's opinion contained in his assessment. Dr. Schmitt opined Plaintiff's respiratory function was

normal except for dyspnea with exertion and Dr. Nutter observed wheezes and clubbing, but no

cyanosis or dyspnea (R. 19). The undersigned finds these medical tests, laboratory findings, and

opinions of physicians contradict and are substantial evidence to support the ALJ's assignment of

"very little weight" to the opinion of Dr. Blatt.

Relative to the assignment of weight to be afforded Dr. Blatt, Plaintiff asserts in his brief that

"the ALJ did not even cite the chest x-rays dated March 5, 2002 . . . ." (Plaintiff's brief at p. 9). The

undersigned finds the above quoted consideration, evaluation, and finding by the ALJ proves this

statement to be inaccurate.

In concluding his assessment of Dr. Blatt's opinion, the ALJ opined the following:

> This evidence regarding the claimant's respiratory impairment supports the continued
> residual functional capacity assessment limiting the claimant to light work with the
> ability to briefly (1-2 minutes) change positions every 30 minutes, no more than
> moderate exposure to heat, cold, wetness, or humidity, and no significant exposure
> to fumes, dusts, gasses, or other respiration irritants, which exacerbate the claimant's
> respiratory condition. It does not support the claimant's testimony that he must
> elevate his legs after sitting for 15 minutes, could only stand for 15 minutes, and only
> lift 10 pounds (R. 19).

The undersigned finds the above recounted evidence of record, specifically, the opinions of

Drs. Schmitt and Nutter, the results of the objective clinical and laboratory diagnostic techniques,

and the contradictory opinions of Dr. Blatt himself, is substantial to support this finding by the ALJ.

In continuing his argument that the "ALJ erred by not affording great weight to the opinion

of Plaintiff's treating sources," Plaintiff contends it was error for the ALJ to give "very little weight"

to Dr. Schmitt's opinion as found in his completed "Form: Physical Residual Functional Capacity

Questionnaire" and the Routine Abstract Form Physical because his assessments of Plaintiff's

limitations therein were not supported by his "sparse office notes that fail to mention certain things."

(Plaintiff's brief at pp. 9-10).

Relative to Dr. Schmitt's opinions, the undersigned finds the ALJ did review the evidence

of record and make the following determination:

> Likewise, very little weight has been given to Dr. Schmitt's similar residual
> functional capacity assessment dated November 22, 2002, or his opinion in the MSS
> dated December 20, 2002, that the claimant was "totally disabled" due to
> hypertension, CAD, and advanced COPD. (Exhibits B10F: B4F, p3). Dr. Schmitt's
> opinions are not supported by his reported findings of all "normal" clinical signs and
> symptoms except for dyspnea on exertion. (Exhibit B4F). Dr. Schmitt also reported
> that the claimant had documented CAD, which is not supported by the objective
> laboratory findings discussed above and in the prior decision. Additionally, Dr.
> Schmitt's finding of "advanced" COPD is not consistent with the "mild" pulmonary
> function testing, chest x-rays, or clinical signs reported by examining physicians,
> including Dr. Blatt and Dr. Nutter. Furthermore, Dr. Schmitt's report that the
> claimant experiences substernal chest pain and dizziness with mild effort is not
> consistent with the claimant's report in June 2003, during his hospitalization that he
> does not experience chest pain with normal activities of daily living and had not had
> severe chest pain for over three years. (Exhibit B14F, p1). Finally, Dr. Schmitt's
> opinion on the claimant's ability to hold any gainful employment or his disability was
> entitled to no controlling weight or special significance because it is on an issue
> reserved to the Commissioner. 20 CFR §§ 404.1527(e) and 416.927(e), and Social
> Security Ruling 96-5p. Consequently, the Administrative Law Judge does not accept
> Dr. Schmitt's conclusions (R. 20).

As he did in his assessment of Dr. Blatt's opinion, the ALJ considered how Dr. Schmitt's

November 22, 2002, and December 20, 2002, opinions as to Plaintiff's limitations were inconsistent

with the results of objective clinical and laboratory diagnostic techniques and the opinions of other

examining physicians. Specifically, Dr. Schmitt's finding that Plaintiff had advanced COPD was

inconsistent with the March 5, 2002, chest x-ray that showed no changes since October 19, 2001 (R.

161); the August 28, 2002, x-ray that was normal (R. 133); the August 28, 2002, ventilatory function test that was positive for mild COPD and mild restrictive pulmonary disease (R. 136); and the June, 2003, x-ray that showed the same pulmonary fibrosis that was evident in December, 2000 (R. 247). Additionally, Dr. Schmitt's diagnosis that Plaintiff had advanced COPD was inconsistent the following clinical signs reported by Drs. Blatt and Nutter: 1) Dr. Blatt observed Plaintiff had wheezes on forced expiration, but no rales or rhonchi; diagnosed COPD; and instructed Plaintiff to "quit smoking" on September 10, 2002 (R. 202); 2) Dr. Blatt observed decreased breath sounds, no rales, no rhonchi, and no wheezes and diagnosed "evidence of COPD" on January 24, 2003 (R. 203); 3) Dr. Blatt observed Plaintiff had decreased breath sounds, wheezes on forced expiration, but no rales or rhonchi; opined Plaintiff was "doing much better than he was a month ago"; and instructed Plaintiff to cease smoking on February 26, 2003 (R. 204); and 4) Dr. Nutter opined Plaintiff had shortness of breath with a history of COPD (R. 131, 136). The undersigned finds Dr. Schmitt's November 22, 2002, and December 20, 2002, opinions as to Plaintiff's limitations relative to Plaintiff's COPD are inconsistent with the results of the objective clinical and laboratory diagnostic techniques and the opinions of other examining physicians as found in the evidence of record.

Finally, Dr. Schmitt's opinions and findings contained within the December 20, 2002, Routine Abstract Form Physical, which he completed for the State of West Virginia Disability Determination Section, do not support his findings relative to Plaintiff's limitations. He found Plaintiff's vision, hearing, speech, gait and station, fine motor ability, gross motor ability, joints, ranges of motion, muscle bulk, reflexes, motor strength, coordination, mental status, breath sounds, edema, heart sounds, extremities, circulation, abdomen, ascites, and skin were all normal. He noted

24

Plaintiff presented with no sensory deficits, no orthopnea or cyanosis, normal sinus rhythms produced in his heart sounds, no chest pain, and no congestive heart failure. He found Plaintiff's dyspnea was normal except with exertion (R. 157). This is persuasive evidence that contradicts Dr. Schmitt's opinion that Plaintiff is totally disabled because every finding by Dr. Schmitt relative to Plaintiff's condition, except for dyspnea on exertion, was normal; therefore, the undersigned finds the ALJ's decision to provide "very little weight" to the opinion of Dr. Schmitt is supported by substantial evidence.

Relative to Dr. Schmitt's finding Plaintiff was disabled due to hypertension and coronary heart disease, the ALJ noted these diagnoses were inconsistent with objective laboratory findings of record and Plaintiff's own statements. The ALJ noted the following persuasive contradictory evidence as to Dr. Schmitt's opinion:

> The claimant's primary care physician Thomas Schmitt diagnosed the claimant with coronary artery disease ("CAD") and hypertension (Exhibit 4F, p3: B10F, p1). Dr. Schmitt's treatment records show the claimant's blood pressure to be well controlled on medication (Exhibits B4F: B8F). Regarding the claimant's purported CAD, the laboratory findings reported in the prior decision did not evidence any significant cardiovascular impairment. Claimant was admitted overnight for complaints of chest pain (Exhibit B16F), but apparently any cardiac impairment was ruled out. Further, Dr. Schmitt reported no abnormal clinical signs of any cardiovascular impairment in a medical source statement ("MSS") dated December 20, 2002. (Exhibit B4F, p2). Additionally medical records from a hospitalization in June 2003, for chest pain following a physical altercation with the boyfriend of the claimant's step-daughter, did not show any significant CAD. The claimant reported that the chest pain lasted less than an hour and was relieved by nitroglycerin. Significantly, the claimant reported last having this type of chest pain over three years earlier and actually denied having any chest pain with normal activities of daily living. (Exhibits B14F, B16F). The claimant's physical examination was essentially normal with no murmur, gallop, and a regular rhythm, with his blood pressure at 118/70. Laboratory testing was likewise essentially normal. The diagnosis was chest pain atypical of angina with "risks" for CAD from hypertension and smoking. A subsequent nuclear perfusion stress test on July 3, 2003, reported no wall motion or perfusion abnormalities and no scintigraphic evidence of left ventricle ischemia, although it was a suboptimal examination. The ejection fraction was 40% (R. Exhibit B14F). (R. 17)

The undersigned finds this analysis effectively establishes the opinions of Dr. Schmitt as to Plaintiff's disability based on coronary artery disease and hypertension were inconsistent with the other substantial evidence of record. Claimant himself reported to Dr. Araujo during his June, 2003, hospitalization that he did not experience any ". . . dizziness, fainting . . . [or] chest pain with daily activity" (R. 17, 249). The results of objective clinical and laboratory diagnostic techniques during Plaintiff's hospitalization do not support a diagnosis of CAD. Plaintiff's EKG revealed "[n]o Q waves" and "[n]o significant resting ischemic ST or T wave changes (R. 244). The July, 2003, stress test showed no ischemia (R. 17, 246).

Dr. Schmitt's own treatment history notes are inconsistent with his findings relative to Plaintiff's limitations based on hypertension and CAD. On June 4, 2000, Dr. Schmitt did not diagnose Plaintiff with coronary artery disease when he was admitted to Wheeling Hospital with chest pain (R. 160). On July 29, August 13, September 24, October 1, and October 14, 2002, Dr. Schmitt noted Plaintiff's blood pressure was within normal limits and there was no diagnosis of coronary artery disease (R. 17, 159, 160). Dr. Schmitt diagnosed "chest pain atypical of angina" during Plaintiff's June, 2003, hospitalization (R. 17, 245).

The undersigned finds Dr. Schmitt's opinions, relative to Plaintiff's being disabled due to hypertension and coronary artery disease, are inconsistent with substantial objective medical evidence of record, Plaintiff's statements, and his own diagnosis on June 23, 2003.

In addition to Plaintiff's contention that the ALJ erred in not affording great weight to the opinions of Drs. Blatt and Schmitt, he asserts the ALJ's rejection of their opinions was "unwarranted and reversible error" because Plaintiff, at the hearing, had difficulty sitting because of pain and had difficulty walking one-half block to the hearing due to "respiratory distress"

(Plaintiff's brief at p. 10) (R. 341, 326). The undersigned finds the ALJ did not reject the opinions of Drs. Blatt and Schmitt; he evaluated their opinions and assigned each "very little weight" based on their inconsistency with the substantial evidence of record (R. 19-20).

The ALJ made the following finding relative to Plaintiff's allegations of pain and Dr. Schmitt's opinions about same: "[r]egarding the claimant's complaints of rheumatoid arthritis and other musculoskeletal impairments, the medical evidence of record does not show any significant change since the prior decision. This [sic] is no evidence that the claimant has rheumatoid arthritis or significant osteoarthritis in his low back, knees, or ankle" (R. 17). The ALJ considered the lack of objective clinical and laboratory diagnostic techniques relative to Plaintiff's allegations of pain in that Plaintiff had "not had any blood work that was positive for rheumatoid arthritis"; Plaintiff presented with "no clinical signs of rheumatoid arthritis," . . . "no rheumatoid nodules, capsular thickening, periarticular swelling or tophi" to Dr. Nutter; there was "no active evidence of synovitis or joint swelling, redness or warmth in any joint"; Plaintiff was diagnosed with "crepitus in his knee and complained of pain but had full range of motion"; Plaintiff complained of back pain, "but straight leg raising was normal as was the neurological examination"; and Plaintiff had full muscle strength and was able to stand on one leg without difficulty, . . . able to walk the heels and toes, . . . . was able to perform tandem gait, but could not rise from a squat without using the floor to get up due to knee pain. (Exhibit B1F)" (R. 17-18). The ALJ also considered that "Dr. Schmitt, the claimant's longtime treating physician, did not even list rheumatoid arthritis and other musculoskeletal impairments in the residual functional capacity assessment dated November 22, 2002, or in the MSS dated December 20, 2002, which also reported all normal musculoskeletal and neurological clinical signs. (Exhibit B4F, pp1-3: B10F)." Based on this analysis, the ALJ found the

"evidence supports the continued finding that the claimant has no severe musculoskeletal impairments and does not support the claimant's testimony that he must elevate his legs after sitting for 15 minutes, could only stand for 15 minutes, and only lift 10 pounds" (R. 18).

As demonstrated in the above analysis by the ALJ, it is evident he considered and weighed the evidence of record provided by Dr. Schmitt as to Plaintiff's pain and determined there was persuasive contradictory evidence on which he relied in ascertaining Plaintiff's RFC. The undersigned finds the ALJ correctly relied on the evidence of record – and not the statements of Plaintiff at the hearing – in assigning Plaintiff's RCF.

As to the ALJ's analysis of the evidence of record relative to the respiratory distress asserted by Plaintiff at the hearing, he found the following: "[a]lthough the claimant testified his lung impairment had deteriorated, the same is simply not supported by the objective medical evidence of record. Contrary to the claimant's testimony, there are no medical records showing any treatment in the emergency room for breathing problems since the prior decision (R. 19)."

As previously noted in the body of this Report and Recommendation/Opinion, The ALJ relied on the diagnoses of Dr. Blatt, which were, at most, for decreased breath sounds, wheezes on forced expiration, but no rales or rhonchi, when formulating Plaintiff's RFC (R. 201, 202, 203, 204). The ALJ considered Plaintiff's March 5, 2002, chest x-ray that showed no changes since October 19, 2001 (R. 19, 161); the August 28, 2002, x-ray that was normal (R. 19, 133); the August 28, 2002, ventilatory function test that was positive for mild COPD and mild restrictive pulmonary disease (R. 19, 136); and the June, 2003, x-ray that showed the same pulmonary fibrosis that was evident in December, 2000 (R. 19, 247). The ALJ also evaluated and considered the opinions of other physicians who evaluated or treated Plaintiff; specifically, Dr. Schmitt's opinion that

28

Plaintiff's respiratory functions were normal except for dyspnea with exertion and Dr. Nutter's observation Plaintiff presented with wheezes and clubbing, but no cyanosis or dyspnea (R. 19).

The undersigned finds the ALJ considered and weighed the evidence of record relative to Plaintiff's respiratory distress. The undersigned finds the ALJ correctly relied on the evidence of record – and not the statements of Plaintiff at the hearing – in assigning Plaintiff's RCF. The undersigned opines that regardless of whether Plaintiff's testimony at the hearing was consistent with the opinions of Drs. Blatt and Schmitt relative to Plaintiff's limitations caused by pain and respiratory distress, those opinions are not supported by the evidence of record; in fact they are inconsistent with the results of objective clinical and laboratory diagnostic techniques, the opinions of other examining and consultative physicians, and the opinions expressed during the course of Plaintiff's treatment by Drs. Blatt and Schmitt, his treating physicians.

For the reasons stated above, the undersigned finds the ALJ did not err in his not assigning great weight to the opinions of Plaintiff's treating physicians, Drs. Blatt and Schmitt, and that substantial evidence supports the ALJ's finding as to the assignment of weight.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _14_ day of October, 2005

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE